**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company, MSPA CLAIMS I, LLC, a Florida limited liability company, and Series PMPI, a designated series of MAO-MSO Recovery II, LLC, a Delaware series limited liability company on behalf of themselves and all others similarly situated, | **Case No. 20-cv-11418** |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| | CLASS ACTION COMPLAINT |
| v. | |
| CARING VOICE COALITION, INC. AND UNITED THERAPEUTICS, CORPORATION, | |
| Defendants. | |
| _____/ | |

## CLASS ACTION COMPLAINT

Plaintiffs, MSP Recovery Claims, Series LLC, MSPA Claims 1, LLC, and Series PMPI,

a designated series of MAO-MSO Recovery II, LLC  (collectively, "Plaintiffs"), on behalf of

themselves and other Medicare Advantage health plans (the "Class Members"),[1] bring this action

against Defendants, Caring Voice Coalition, Inc. ("CVC") and United Therapeutics Corporation

("UT") (collectively, "Defendants"), and allege:

---

[1]     The Class Members consist of Medicare Advantage health plans—*i.e.*, Medicare Advantage entities such as Medicare Advantage Organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service Organizations ("MSOs"), Health Maintenance Organizations ("HMOs"), and other Medicare first tier and downstream entities—and their assignees (collectively referred to as "MA Plans" or "Medicare Advantage health plans").

## NATURE OF ACTION

1.      This case arises from Defendants' conspiratorial scheme to increase the unit price

and volume of certain drugs that UT manufactures and for which Plaintiffs' assignors

("Assignors") and the proposed Class paid on behalf of Medicare beneficiaries, by

circumventing the Congressionally mandated, co-payment requirement aimed at suppressing

price inflation and non-medically necessary purchases.[2]

2.      The products at issue are medicines that UT manufactures and markets to treat

pulmonary arterial hypertension ("PAH")—including Adcirca, Remodulin, Tyvaso, and

Orenitram (collectively, the "UT Hypertension Drugs").  Hereinafter, Defendants' scheme will

be referred to as the "**Co-payment Circumvention Enterprise**."

3.      In December 2017, UT paid $210 million and entered into a Settlement

Agreement with the United States of America ("Settlement"), acting through the United States

Department of Justice and on behalf of the Office of Inspector General ("OIG") of the

Department of Health and Human Services ("HHS") (collectively, the "United States") regarding

the same general conduct at issue in this lawsuit (*See* UT Settlement Agreement, attached as

**Exhibit A**).  Under the terms of the UT Settlement, UT paid the United States $210 million to

settle the United States' claims that UT violated the Anti-Kickback Statute and False Claims Act.

4.      While the Department of Justice's Settlement with UT addressed some of the

damage suffered by the Federal Government, it did not address or settle the injuries suffered by

Plaintiffs and other Medicare Advantage health plans who administer Medicare benefits pursuant

---

[2]      When Medicare beneficiaries, including those covered by Medicare Advantage health
plans, obtain a prescription drug, the beneficiaries may be required to make a co-payment.
Congress included co-payment requirements in the Medicare structure, in part, to encourage
market forces to serve as a check on health care costs, specifically including the prices that
pharmaceutical companies can demand for their drugs.

to Medicare Part C and Part D.  None of the parties or agencies to the UT Settlement represented the interests of Plaintiffs, their Assignors, or the absent class members in this case.  The terms of the UT Settlement did not provide any remuneration or other relief to Plaintiffs or otherwise address the claims Plaintiffs bring in this lawsuit.

5.     To carry out the Co-payment Circumvention Enterprise, UT used CVC, a foundation which claims 501(c)(3) status for tax purposes, as a conduit to pay the co-payment obligations for thousands of Plaintiffs' Assignors' covered patients who were prescribed the UT Hypertension Drugs.  UT made "donations" to CVC's PAH fund, which in turn used UT's "donations" to improperly fulfill beneficiary co-payment obligations.  In doing so, Defendants induced patients' purchases of the UT Hypertension Drugs, knowing that once the co-payment was paid by their enterprise, Plaintiffs' Assignors or Medicare would be on the hook for paying for the UT Hypertension Drugs.  Defendants' illegal acts caused Plaintiffs' Assignors and members of the classes alleged in this lawsuit to pay many millions of dollars for UT Hypertension Drugs that would not have been purchased but for the illegal conduct.

6.     UT routinely obtained data from CVC detailing the number of patients for whom CVC paid a co-payment for UT's Hypertension Drugs, as well as the amounts that CVC paid for those co-payments.  UT regularly analyzed their "donation" amount, ensuring an adequate return on their corporate "goodwill" was realized. That is, UT used the data it received from CVC to confirm that UT's revenue from CVC-linked patients far exceeded the amount of UT's donations to CVC.  This led to an annual, repeated cycle where UT quantified how much money it made through CVC the year before and would "donate" even more money to CVC the next year, confident that its donation would result in an even larger return.  In turn, this grew CVC's PAH

3

fund and its overall revenue—growth CVC's officers and directors used to pay greater compensation to themselves.

7.      At the same time, UT had a policy of not permitting Plaintiffs' Assignors' covered patients, and all Medicare Beneficiaries for that matter, to participate in UT's free drug program, which was open to other financially needy patients who could not afford their co-payments for UT Hypertension Drugs.  Instead, in order to generate revenue and induce purchases of the UT Hypertension Drugs, UT referred Plaintiffs' Assignors' covered patients to CVC, triggering Plaintiffs' Assignors' obligation to then cover the cost of the drugs.  In this way, UT directed Plaintiffs' Assignors' covered patients away from UT's free-drug program—where UT would have borne all the costs—and to CVC, where Plaintiffs' Assignors bore all the costs (less the co-payment), and UT reaped the revenues.  With Plaintiffs' Assignors then bearing the cost of the UT Hypertension Drugs, Defendants eliminated the price sensitivity of patients purchasing or physicians prescribing the UT Hypertension Drugs that Congress purposefully legislated into the Medicare program.

8.      Plaintiffs bring this lawsuit to redress injuries caused to Plaintiffs' Assignors and the similarly situated absent class members ("Class Members") as a result of Defendants' Co-payment Circumvention Enterprise.

## PARTIES

### *Plaintiffs*

9.      MSP Recovery Claims, Series LLC, is a Delaware entity with its principal place of business located at 2701 S. LeJeune Rd. 10th Floor, Coral Gables, FL 33134.  MSP Recovery Claims, Series LLC's members are citizens of Florida and Texas.  Certain Medicare Advantage health plans across the United States have assigned their rights and claims, including the claims

set forth herein, to MSP Recovery Claims, Series LLC.  As a result of these assignments, MSP

Recovery Claims, Series LLC has standing to pursue the claims of its Assignors that were

injured by Defendants' Co-payment Circumvention Enterprise.[3]

10.     Plaintiff MSPA Claims 1, LLC is a Florida entity, with its principal place of

business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, FL 33134.  MSPA Claims 1,

LLC's members are citizens of Florida.  Certain Medicare Advantage health plans across the

United States have assigned their rights and claims, including the claims set forth herein.  As a

result of these assignments, MSPA Claims 1, LLC, has standing to pursue the claims of its

Assignors that were injured by Defendants' Co-payment Circumvention Enterprise.

11.     Plaintiff Series PMPI, a designated series of MAO-MSO Recovery II, LLC, is a

Delaware series limited liability company, with its principal place of business located at 45

Legion Drive, Cresskill, NJ 07626.  Series PMPI's citizens are members of Florida, New Jersey,

and New York.  Preferred Medical Plans, Inc. assigned its rights and claims, including the claims

set forth herein to Series PMPI.  As a result of these assignments, Series PMPI, has standing to

pursue the claims of Preferred Medical Plan, Inc. that was injured by Defendants' Co-payment

Circumvention Enterprise.

12.     After Defendants' Co-payment Circumvention Enterprise triggered payment

obligations, Plaintiffs' Assignors paid Medicare benefits for the Medicare-eligible beneficiaries

enrolled under the Medicare Advantage program by paying for UT's Hypertension Drugs. The

---

[3]     Plaintiff MSP Recovery Claims, Series LLC has established various specific Series for
which it is the exclusive owner. The specific Series identify the Assignors assigning to Plaintiff.
All specific Series form a part of Plaintiff and are owned by Plaintiff. Plaintiff owns and controls
any and all Series interest and all claims and rights transferred from any Assignor and seeks
relief for each Assignor who made payments for which Defendants are liable.

illegal conduct described in this lawsuit directly caused damage to Plaintiffs' Assignors and the Class Members.

### Defendants

13.     Defendant United Therapeutics Corporation is a Delaware corporation with its principal place of business located at 1040 Spring Street, Silver Spring, Maryland 20910.  UT manufacturers and markets pharmaceutical products, including the UT Hypertension Drugs, in the United States.

14.     Defendant Caring Voice Coalition, Inc. is an Idaho corporation claiming 501(c)(3) status for tax purposes, CVC's principal place of business during the duration of the scheme was located at 6606 West Broad Street, Suite 403, Richmond, Virginia 23230, however, pursuant to a filing with the Commonwealth of Virginia, on July 31, 2019, CVC, changed their principal place of business to P.O. Box 28955, Henrico, VA 23228.  CVC was established in 2003 and operates disease funds, including the PAH fund, to pay the co-payments of certain patients, including Medicare patients.

## JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The causes of action alleged in this complaint arise under federal law.

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because Plaintiffs are completely diverse from Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs,

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from the Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

18.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal claims as to form part of the same case or controversy.

19.     This Court has personal jurisdiction over Defendants under the Massachusetts long-arm statute because Defendants transacted business in Massachusetts that gave rise to the causes of action set forth herein.  Defendants paid and/or conspired to pay co-payments for Medicare beneficiaries in Massachusetts in furtherance of their Co-payment Circumvention Enterprise.  Defendants also possess sufficient minimum contacts within Massachusetts, so that they could reasonably expect being haled into court in Massachusetts.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in Massachusetts. Plaintiffs' Assignor, Fallon Community Health Plan, Inc. is a Massachusetts corporation with its principal place of business in Worcester, Massachusetts. Fallon Community Health Plan, Inc. purchased the UT Hypertension Drugs in Massachusetts.  Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) because Defendants transact their affairs in Massachusetts and because the investigation and resolution of the claims brought against UT by the United States took place in Massachusetts and was conducted by the United States Attorneys' Office, District of Massachusetts.

## STANDING

21.     Plaintiffs' Assignors provide Medicare benefits to beneficiaries who have elected coverage under Medicare Part C or Medicare Part D under either (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements; or (ii)

state and federal laws that provide for the reimbursement of payments made by the assignor health plans.

22.     The assignments the Assignors provided to Plaintiffs are valid and binding contracts, empowering Plaintiffs to bring and recover on the claims asserted in this lawsuit.

23.     Although Plaintiffs seek recovery on behalf of each of their Assignors who were unlawfully forced to pay for the UT Hypertension Drugs, one representative assignment for each Plaintiff is alleged in detail in the Appendix to establish standing.[4] A copy of each representative assignment is attached hereto as **Exhibits B-D** and explained in more detail in the Appendix.[5]

24.     At all material times hereto, one of more of Plaintiffs' Assignors provided Medicare benefits to Medicare Advantage plan beneficiaries after obligations to cover payments for UT Hypertension Drugs were triggered by Defendants' Co-payment Circumvention Enterprise.  Plaintiffs' Assignors paid more than $24.8 million in claims on behalf of covered patients receiving UT Hypertension Drugs from January 1, 2010 through December 31, 2017. Plaintiffs' Assignors provided payment for their beneficiaries UT Hypertension Drugs throughout the United States, including in the state of Massachusetts.

---

[4]     At the time of filing the additional Assignors include: Alianza Profesional de Cuidado Medico, Inc., Avmed, Inc., Broward Primary Partners, LLC, ConnectiCare, Inc., EmblemHealth Services Company, LLC, Family Physicians Group d/b/a Family Physicians of Winter Park, Inc., Health Care Advisor Services, Inc., Health First Health Plans, Inc., Hygea Health Holdings, MCCI Group Holding, LLC, Medical Consultants Management, LLC, Network Health, Inc., Physician Access Urgent Care Group, LLC, Ponce Advance Medical Group, P.S.C., Preferred Primary Care, LLC, Primary Physicians Medical Service, LLC, Professional Health Choice, Inc., Quality Medical Care, Inc., Risk Watchers, Inc., SE Primary Care Services, CSP, SummaCare, Inc., Suncoast Provider Network, Inc., University Health Care MSO, Inc., and Verimed IPA, LLC.

[5]     Plaintiffs have redacted confidential business information from the assignment agreements.

## REGULATORY BACKGROUND

25.    In 1965, Congress amended the Social Security Act to create the Medicare Act under Title XVIII of the U.S. Code.  The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled.  The Medicare Act consists of five parts — Parts A, B, C, D and E.  Part A and Part B "create, describe, and regulate traditional fee-for-service, government-administered Medicare."  *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 357 (3rd Cir. 2012) (citing 42 U.S.C. §§ 1395c-1395i-5; 1395j-1395w).  Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits.  42 U.S.C. §§ 1395w-21-29.  Part D provides for prescription drug coverage to Medicare beneficiaries. Plaintiffs' Assignors provide Medicare benefits under Parts C and D.

26.    Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003.  Medicare Part D took full effect in 2006.  A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

27.    Unlike Parts A and B, yet similar to Medicare Part C, Medicare Part D is based on a private-market model, wherein Medicare contracts with private entities, known as Part D "sponsors."  These sponsors administer prescription drug plans, and plan sponsors must provide qualified prescription drug coverage.

28.    A Part D sponsor submits a bid the year before it is to deliver Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

29.     If the Part D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium.  CMS then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

30.     In 2017, for Medicare Part D beneficiaries, there was an initial $400-deductible phase during which many Medicare Part D plan participants pay the entire bill for their prescription drugs. [6]

31.     After meeting the $400 deductible, Medicare Part D sponsors are responsible for 75% of all payments in the second phase. Beneficiaries stay in this phase until they and the plan have spent a total of $3,700 on covered drugs.

32.     Upon hitting the second coverage breakpoint, the beneficiary is in the Medicare Part D "Doughnut Hole," which refers to a coverage gap phase where the beneficiary must pay for branded drugs at 40% of the list price. The manufacturer discounts branded drugs by 50%, and the plan pays the remaining 10%.

33.     When a beneficiary spends more than $4,950 out of his or her own pocket, the beneficiary leaves the "Doughnut Hole" and is again covered. This is also when total drug costs covered by the participant, the plan, and discounts reach $7,425. For the rest of the year, beneficiaries either pay a coinsurance amount of 5% of the covered drug cost of $8.25 for brands, whichever is greater.

---

[6]     Medicare Part D coverage changes yearly. Plaintiffs have included the coverage information from 2017, the time period in which Plaintiffs alleged Defendants' conspiratorial scheme to increase the unit price and volume of certain drugs that UT manufactures occurred.

34.     The chart below details the Medicare Part D Standard Benefit design in 2017:

**Standard Part D Coverage for 2017**

| Coverage | | Part D Plan Pays | Beneficiary Pays |
|---|---|---|---|
| Annual Deductible ($400) | | $0 | $400 |
| Initial Coverage Period (>$400-$3,700) | | 75% of $3,300 | 25% of $3,300 |
| Coverage Gap ("Donut Hole")<br>Once your total drug costs (what you and your plan pay) exceed $3,700, you are in the 'donut hole.' | | $0 (For brand name drugs, the 50% discount comes from drug manufacturers + 10% subsidy. For generic drugs, there is a 49 subsidy.) | 40% of covered brand name drugs; 51% of covered generic drugs |
| Catastrophic Coverage<br>This begins once you've reached your 'out-of-pocket threshold' of $4,950 in 2017. ($400 deductible + $825 initial coverage + $3,725 'donut hole') | | 95% or the drug cost minus the copay | Greater of 5% of the drug costs or $3.30 for a generic drug or $8.25 for a brand name drug |

35.     Medicare Advantage entities and other Medicare Part C entities play an important role in the American healthcare landscape.  They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation."  *In re Avandia, Sales Practices & Products Liability Litigation*, 685 F.3d 353, 363 (3d Cir. 2012).  In 2017, 33% of Medicare-eligible individuals got their health insurance from Medicare Advantage entities.

36.     Medicare Advantage entities cannot play the vital role that Congress intended if they are hamstrung by a competitive disadvantage. When Medicare Advantage entities "faithfully pursue and recover from liable third parties," they "will have lower medical expenses and will therefore be able to provide additional benefits to their enrollees." *Id.* (quoting *Policy and Technical Changes to Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19678, 19797 (April 15, 2010)).

## FACTS

### Patient Assistance Programs, The Anti-Kickback Law, and the Rise of Pharmaceutical Corporate "Giving"

37.     "Part D enrollees with high drug costs can have difficulty affording their medications when they are in the deductible phase [and] when they reach the coverage gap—the period in which they are required to pay a larger share of total drug costs."  Congressional Research Service, *Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)*, June 15, 2017.  Patient assistance programs ("PAPs") are designed to help financially needy patients afford necessary medications during this difficult period.

38.     There are two ways that pharmaceutical companies give to PAPs.  First, manufacturers can establish their own PAPs.  "Under this option, pharmaceutical companies give drugs directly to patients who cannot afford them or donate the drugs to a foundation that then gives them to patients.  The second option is through independent charity PAPs (herein referred to as "co-payment charities")."  Austin Frerick, *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, Tax Notes, Vol. 153, No. 9, Nov. 28, 2016.  CVC is an independent charity PAP, or co-payment charity.

39.     For co-payment charities, pharmaceutical companies donate money to the charity, and people who cannot afford their drugs but have insurance (usually Medicare) can apply to these charities to cover all or a portion of their drug costs.

40.     There are two key differences between these two giving options.  "First, companies donate drugs in option 1 and money in option 2.  Second, pharmaceutical companies receive no money besides a [tax] deduction in option 1, ***but under option 2 they receive a [tax] deduction and money from the insurer paying the other portion of the drug costs***.  Thus, assistance provided by option 2 reduces out-of-pocket costs to insured patients but do[es] not

reduce the price of prescription drugs to the healthcare payer.  These are one-sided discounts."
*Id.* (emphasis added).

41.    A small donation to a co-payment charity results in a pharmaceutical company receiving a substantial portion of the prescription's cost from Medicare Advantage Plans.[7]

42.    As pharmaceutical drug company "giving" to co-payment charities rises, the co-payment charity benefits. In fact, executives at co-payment charities are among some of the *highest paid executives* in the United States, CVC is not an outlier in this phenomenon. With the increase in CVC donations, came an increase in CVC executive salaries. Pamela R. Harris, the President and Chairman of CVC received a salary of $233,457 in 2011. By comparison, in 2015, she received a salary of $378,200. This salary increase has a direct correlation to the amounts of donations CVC received from pharmaceutical manufacturers, like UT. CVC's contributions and grants increased from $49 million in 2011, to more than $131 million in 2015.

43.    Accordingly, in this context, pharmaceutical companies and co-payment charities have a mutually beneficial purpose—to receive donations, establish additional disease funds to cover co-payments of the pharmaceutical company's expensive, specialty drugs, and ensure

---

[7]    *See* Michael Banigan, *A Guide to Patient Assistance Programs: What You Need to Know to Promote Patient Advocacy and Maximize Charitable Contributions*."  Chronic Disease Fund Inc. (2016) (providing that pharmaceutical companies can calculate their profitability, or "charitable margin," as a result of their donations to co-payment charities and can stand to earn 220 percent charitable margins). *See also* Austin Frerick, *The Cloak of Social Responsibility:Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016 (explaining that example of "charitable margin" can yield a "charitable margin of 220 percent"); *see also* Citi Research, *The Straw that Could Break the Camel's Back: DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns*, May 16, 2017 (explaining that "[e]ach $1m industry donation to a charitable foundation to enable Medicare patients Xtandi access or similar high priced drugs has the potential to generate up to $21m for the sponsor company, ***funded by the US Government***.") (emphasis added).

Federal healthcare programs bear the cost of these expensive, specialty drugs, so the co-payment charity can demonstrate "results" for the pharmaceutical company to justify increased donations.

44.     Given these shared economic incentives, it's no surprise that charitable assistance from co-payment charities increased from $11 million in 2004 to nearly $868 million in 2014. Frerick, A., *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016 (noting that from 2007 to 2009, during the Great Recession, pharmaceutical giving increased by nearly $1.5 billion, whereas overall corporate giving decreased by $1.2 billion). The chart below details total giving for certain co-payment charities, including CVC, from 2001-2014:

| Table A-1. Total Giving in Dollars for Independent Charity Patient Assistance Programs (PAPs), 2001-2014 | | | | | | |
|---|---|---|---|---|---|---|
| | Patient Access Network Foundation[a] | Chronic Disease Fund/ Good Days[b] | Caring Voice Coalition[c] | Healthwell Foundation[d] | Patient Services | Subtotal: Independent Charity PAPs |
| 2001 | — | — | — | — | $2,328,611 | $2,328,611 |
| 2002 | — | — | — | — | $3,296,181 | $3,296,181 |
| 2003 | — | — | — | — | $5,118,345 | $5,118,345 |
| 2004 | — | — | — | — | $6,982,842 | $11,301,748 |
| 2005 | $7,557,312 | $5,597,689 | $5,257,803 | $15,856,793 | $15,719,269 | $49,988,866 |
| 2006 | $18,652,884 | $64,279,917 | $9,850,206 | $47,289,619 | $15,333,700 | $157,406,276 |
| 2007 | $24,880,629 | $63,551,710 | $15,816,549 | $59,591,157 | $21,467,030 | $185,107,065 |
| 2008 | $32,825,596 | $82,133,885 | $27,943,050 | $57,521,456 | $35,269,942 | $235,693,929 |
| 2009 | $37,323,252 | $136,713,152 | $37,530,593 | $71,425,660 | $29,594,995 | $312,587,592 |
| 2010 | $37,562,665 | $172,488,043 | $38,166,963 | $84,233,714 | $37,440,434 | $369,891,819 |
| 2011 | $28,379,485 | $195,647,202 | $46,827,156 | $48,521,777 | $39,983,874 | $360,359,494 |
| 2012 | $108,460,641 | $182,365,638 | $58,221,721 | $36,995,288 | $50,332,148 | $436,375,436 |
| 2013 | $174,340,174 | $194,448,004 | $67,435,466 | $31,135,498 | $60,897,475 | $528,256,617 |
| 2014 | $406,427,781 | $170,628,203 | $98,027,589 | $29,039,150 | $73,735,080 | $867,857,753 |

*Source*: ProPublica's Nonprofit Explorer Database.
*Notes*: These totals come from line 13 titled "Total Grants" on Form 990, although for some entities before 2008, the totals come from line 23, part II.
[a]Excluded 2004 return because it was an initial return.
[b]Excluded 2004 return because it was an initial return.
[c]Excluded 2002 return because it was an initial return and their reporting years run July to June.
[d]Excluded 2004 return because it was an initial return.

45.     The rise of co-payment charities and pharmaceutical corporate giving to such charities (with the economic incentives detailed above) is tied to the enactment of public insurance programs expanding the number of Americans with prescription drug coverage, the growth of specialty drugs, and the federal anti-kickback law.

46.     First, this increased giving to co-payment charities occurred during a period in which there was a major increase in the number of Americans with prescription drug coverage as

a result of the enactment of Medicare Part D and, subsequently, the passing of the Affordable

Care Act in 2010 ("ACA"), which expanded Medicaid in providing prescription drug benefits.

"Before these public insurance expansions, federal government spending on prescription drugs

was 25 percent of total spending in 2005.  In 2014 it was 41 percent." Frerick, A., *The Cloak of*

*Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28,

2016.

47.     Second, in addition to these public insurance programs, specialty drugs (*i.e.*,

generally defined as expensive prescriptions requiring extra handling or administration in

treating complex diseases) have contributed to the growth of co-payment charities.  "In recent

years, spending for specialty drugs has grown faster than spending for other pharmaceuticals.

Although specialty medications account for only 1 percent of prescriptions, they account for

almost a third of U.S. prescription spending.  For Medicare Part D, specialty drugs accounted for

0.25 percent of prescriptions in 2013 but 11 percent of total drug cost."  Frerick, A., *The Cloak of*

*Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28,

2016

48.     Co-payment charities allow pharmaceutical companies to manage price sensitivity

for these more expensive specialty drugs.  The OIG noted that PAPs "may steer patients toward

and lock them into a particular manufacturer's product, even when other equally effective and

less costly alternatives are available."  Frerick, A., *The Cloak of Social Responsibility:*

*Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016

49.     Moreover, the rise of co-payment charities was in response to federal anti-

kickback law. The original version of the Anti-Kickback Statute ("AKS") was passed by

Congress in 1972 to combat unethical provider practices that began to develop after the

establishment of the Medicare and Medicaid programs.  The statute made the receipt of

kickbacks, bribes, or rebates in connection with items or services covered by the Medicare and

Medicaid programs a crime. The AKS makes it a crime to knowingly and willfully offer, pay,

solicit or receive any remuneration to induce a person to purchase or recommend any good,

service, or item covered under a federal health care program.  *See* 42 U.S.C. § 1320a-7b(b).

50.     As it relates to PAPs, the OIG has stated that the AKS could be violated "if a

donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the

donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a

patient is made "to influence the patient to purchase (or induce the patient's physician to

prescribe) certain items."  79 Fed. Reg. at 31121.

51.     Congress has determined that any Medicare claim "that includes items or services

resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of

the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FAC"). *See* 42 U.S.C. § 1320a-7b(g).

### *OIG Guidance for Co-payment Charities*

52.     Since 2005, in advance of Medicare Part D taking full effect, the OIG has

provided guidance to co-payment charities regarding compliance with applicable laws and

regulations, including the AKS and FCA. In this guidance, the OIG made clear that such

charities will run afoul of those laws and regulations if they do not follow specified rules. Those

rules ensure that a pharmaceutical manufacturer cannot control a co-payment charity, or receive

information from such a charity, that would allow the manufacturer to link the amount it donates

to additional profits from the sale of a particular drug.

53.     Initially, in 2005, the OIG issued a special advisory bulletin on PAPs (the "2005

Special Advisory Bulletin").  The 2005 Special Advisory Bulletin provided that certain cost-

sharing subsidies provided by *bona fide*, independent PAPs unaffiliated with drug manufacturers do not raise AKS concerns, even if the PAPs receive manufacturer contributions.  *See* OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), attached as **Exhibit E**.  The 2005 Special Advisory Bulletin also set forth factors that the OIG considers to be "fundamental" to a properly structured, independent, *bona fide* PAP, including the following:

- No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

- The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donor's funding and the beneficiary;

- The PAP awards assistance without regard to the drug manufacturer's interests, or the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

- The PAP provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and

- The drug manufacturer does not solicit or receive data from the PAP that would facilitate the manufacturer in correlating the amount of frequency of its donations with the number of subsidized prescriptions for its products.

*Id.* at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices.").

54.     However, in 2014, the OIG issued an updated bulletin raising concerns about the conduct of co-payment charities and intensifying its scrutiny of arrangements between pharmaceutical companies and co-payment charities (the "2014 Special Advisory Bulletin").  *See* Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120 (May 30, 2014), attached as **Exhibit F**.  In the 2014 Special Advisory Bulletin,

the OIG stated that although PAPs can provide an important safety net assistance to financially needy patients, these programs also present a risk of fraud, waste, and abuse with respect to federal health care programs if they are not sufficiently independent from donors.  *Id.*

55.     The OIG thereafter noted three additional areas of concern related to disease funds, eligible recipients, and the conduct of donors, and required co-payment charities to certify to the OIG that:

- The co-payment charity will not define its disease funds by reference to specific symptoms, severity of symptoms, method of administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states.

- The co-payment charity will not maintain any disease fund that provides co-payment assistance for only one drug, or only the drugs made or marketed by one manufacturer or its affiliates; and

- The co-payment charity will not limit its assistance to high-cost or specialty drugs.  Instead, the co-payment charity will make assistance available for all products, including generic or bioequivalent drugs covered by Medicare or other insurers, when prescribed for the treatment of the disease state(s) covered by the fund.

*Id.*

56.     With respect to the "conduct of donors," the 2014 Special Advisory Bulletin reiterated its prior focus [from the 2005 Special Advisory Bulletin] on co-payment charities not [giv]ing a "donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP." *Id.*  Notably, the OIG warned that:

> [t]he procedures described in these certifications are a critical safeguard and a material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products.  Such actions may be indicative of a donor's intent to channel its financial support

> to co-payments of its own products, which would implicate the anti-
> kickback statute.

*Id.*

### CVC's Growth and OIG's Communications

57.     CVC was founded in 2003 as a national 501(c)(3) non-profit, charitable

organization aimed at providing monetary support for financially needy patients with certain

chronic or life-threatening diseases.  CVC established certain disease funds, including the PAH

fund, which were funded by donors, including UT. As detailed in paragraph 42, CVC grew from

receiving $80,383 from donors in 2004 to receiving over $131 million from donors in 201.  The

UT Settlement with the United States generally describes UT's giving to CVC, including

specifically to CVC's PAH fund. But neither the Settlement nor CVC's annual Form 990 Tax

Filings detail UT's specific annual donations (Schedule B of CVC's Form 990 Tax Filings

provide "Total contributions" amounts without specifically identifying the contributor).

58.     CVC violated one of the most basic rules that separates legitimate co-payment

charities from illegal ones—it provided information so UT could correlate its donations with its

increased profits on the sale of specific drugs—and then CVC lied about it to the OIG.

59.     In 2006, CVC certified to the OIG that it would comply with the requirements

outlined above in the OIG's 2005 Special Advisory Bulletin.  CVC subsequently requested an

advisory opinion from the OIG inquiring whether its "Proposed Arrangement" as a nonprofit,

tax-exempt, charitable corporation's proposal to provide financially needy Medicare

beneficiaries with assistance and cost-sharing obligations under Medicare Part B, Medicare Part

D, Medigap, ***and Medicare Advantage*** would constitute grounds for sanctions under certain

federal laws, including the AKS.  In response, on April 20, 2006, the OIG issued an Advisory

Opinion to CVC.  *See* OIG, Adv. Op. 06-04 (April 20, 2006), attached as **Exhibit G**.

60.     The 2006 CVC Advisory Opinion noted CVC's certification that, among other requirements, no donor had exerted or will exert "any direct or indirect influence or control" over CVC.  *Id.* ("[CVC] has certified that no donor or affiliate of any donor (including, without limitation, any employee, agent, officer shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) has exerted or will exert any direct or indirect influence or control over [CVC] or any of [CVC]'s programs.").

61.     The 2006 CVC Advisory Opinion provided that upon request and as a courtesy, donors will be informed monthly of the aggregate number of patients who qualify for assistance in a category, but highlighted CVC's certification that "the monthly data will not contain any information that enable a donor to correlate the amount or frequency of its donation with the number of subsidized prescriptions or orders for its products or the volume or medical condition of patients choosing its services."  *Id.* ("No individual patient information will be conveyed to donor, nor will any data related to the identity, amount, or nature of products or services subsidized under the Proposed Arrangement.").

62.     The OIG concluded, in part, that "[b]ased on the facts certified in [CVC's] request for an advisory opinion and supplemental submissions . . .  [and subject to various limitations set forth by the OIG] while the Proposed Arrangement could potentially generate prohibited remuneration under the anti-kickback statute, if the requisite intent to induce or reward referrals of Federal health care program business were present, the OIG would not impose administrative sanctions on [CVC] under [federal laws regarding civil monetary penalties] in connection with the Proposed Arrangement." *Id.*

63.     In December 2015, the OIG published a Modified Advisory Opinion to CVC following the OIG's request that CVC certify compliance with the additional factors outlined in

the 2014 Special Advisory Bulletin (the "2015 CVC Modified Advisory Opinion"), attached as **Exhibit H**. *See* OIG, Adv. Op. 06-04 (Dec. 23, 2015).  The 2015 CVC Modified Advisory Opinion stated that CVC had certified compliance to each additional factor, and further that CVC had proposed additional modifications to its current operations. *Id.*  The OIG concluded in the 2015 CVC Modified Advisory Opinion that CVC's PAP was sufficiently low risk and the OIG would not impose civil monetary penalties or sanctions on CVC under the AKS. *Id.*

64.     CVC was admittedly on notice of the OIG's guidance, cautionary language, and the certification requirements set forth in the 2005 and 2014 Special Advisory Bulletins, as well as the Advisory Opinions OIG provided specifically to CVC.  In fact, CVC even designed a "Compliance Program" "to assist CVC in preventing, detecting and responding to illegal, improper and unethical conduct . . . [and to] serve as a procedural framework for enhancing and monitoring compliance with applicable law, regulation, the CVC Code of Conduct and organizational policies and procedures. ***The Compliance Program is based on . . . applicable [OIG] guidance.***"  (*See* Summary of the CVC Compliance Program, attached at **Exhibit I** (emphasis added).)

65.     In turn, CVC's "Code of Conduct" purports to "describe[] the commitment that [CVC] expects of itself . . . to maintain the highest ethical standards of honesty and integrity as well as to comply with all laws and legal requirements applicable to [CVC], including [OIG] guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, as modified, and industry guidance, including the Independent Charitable Patient Assistance Program Code of Ethics ('IPAP Code of Ethics')."  (*See* CVC's Code of Conduct, attached at **Exhibit J.**)  According to CVC's Code of Conduct, based on its "core values," CVC represented that it was "dedicated to the following values/ethical principles . . . [among others]":

- Act with honesty, integrity and objectivity, and in a manner that will merit the continued trust and confidence of patients and stakeholders.

- Operate independently, free from the influence of CVC donors.

  . . .

- Comply with all federal, state, and local laws, regulations, and legal requirements applicable to CVC, including OIG guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, as modified.

  . . .

- Be vigilant in the detection and prevention of potential fraud, waste or abuse.
  . . .

- Promptly investigate and address potential violations of applicable law, regulation, OIG guidance, CVC's Advisory Opinion, IPAP Code of Ethics, this Code, or Company policies and procedures.

*Id.*

66.     The referenced IPAP Code of Ethics that CVC committed to comply with similarly provides that co-payment charities "[o]perate under the auspices of an ongoing compliance with an organization-specific [OIG] Advisory Opinion," and "[o]perate independently, free from the influence of donors," which included "[r]efrain[ing] from providing donors or other entities with information that could permit the correlation of the amount or frequency of donations with the number of patients assisted by the [co-payment charity] who use a donor's products or services or the volume of those products supported by the [co-payment charity]."  (*See* IPAP Code of Ethics, attached at **Exhibit K.**)

67.     Nonetheless, CVC shared with UT the very information it promised it wouldn't share and steered patients toward the UT Drugs in violation of the OIG's general guidance, the OIG's specific guidance to CVC, CVC's certifications to the OIG, CVC's internal "compliance"

policies the FCA, and the AKS.  Because of this, in November 2017, the OIG rescinded its prior

advisory opinions issued to CVC (the "2017 CVC Rescission Letter").  *See* OIG, Adv. Op. 06-04

(Nov. 28, 2017), attached as **Exhibit L**.  The 2017 CVC Rescission Letter was based on CVC's

"failure to fully, completely, and accurately disclose all material facts to OIG," and CVC's

failure to comply with certain factual certifications made to the OIG.  *Id.*

> Specifically, we have determined that, in contravention of the certifications [CVC] made, [CVC]: (i) provided patient-specific data to one more donors that would enable the donor(s) to correlate the amount and frequency of their donations with the number of subsidized prescriptions or orders for their products, and (ii) allowed donors to directly or indirectly influence the identification or delineation of [CVC's] disease categories."

*Id.*

68.     The 2017 CVC Rescission Letter concluded that:

> [CVC]'s failure to comply with these certifications materially increased the risk that CVC served as a conduit for financial assistance from a drug manufacturer donor to a patient, and thus increased the risk that the patients who sought assistance from [CVC] would be steered to federally reimbursable drugs that the manufacturer donor sold.  This type of steering can harm patients and the Federal health care programs, because, for example, patients may be urged to seek, and physicians may be more likely to prescribe, a more expensive drug if co-payment assistance is available for that drug but not for less expensive but therapeutically equivalent alternatives.  ***In these circumstances, manufacturers may have greater ability to raise the prices of their drugs while insulating patients from the immediate out-of-pocket effects of price increases, leaving Federal healthcare programs like Medicare (and the taxpayers who fund those programs) to bear the cost.***

*Id.* (emphasis added).[8]

---

[8]     CVC subsequently announced that in light of the 2017 CVC Rescission Letter, it would not open financial assistance for any disease fund in 2018.  *See* http://www.caringvoice.org/decision-2018-financial-assistance.

### The UT Settlement

69.     The UT Settlement and facts alleged therein, which specifically relate to the

conduct identified by the OIG in its 2017 CVC Rescission Letter, represent one result of a much

larger ongoing investigation by the DOJ and OIG, along with the U.S. Attorney's Office for the

District of Massachusetts, into schemes by various drug manufacturers and co-payment charities

that violated the AKS and FCA.[9]  As recognized by pharmaceutical-industry financial analysts,

these investigations could "impede industry returns."  *See* Citi Research, *The Straw that Could*

*Break the Camel's Back: DOJ/OIG Action on Foundation Funding Could Severely Impede*

*Industry Returns*, May 16, 2017 (noting that "[t]he ongoing multiple DOJ/OIG investigations

into financial donations by pharmaceutical companies to independent foundations has the

---

[9] Other recent results involving the resolution of AKS and FCA claims brought by the United States on behalf of Medicare (not Medicare Advantage) against drug manufacturers participating in improper schemes with co-payment charities include, but are not limited to: (i) Jazz Pharmaceuticals PLC ("Jazz") agreeing in May 2018  to pay the United States $57 million related to claims involving Jazz's relationship with CVC to fund co-payment for  Jazz's narcolepsy drug Xyrem; (ii) Pfizer Inc. ("Pfizer") agreeing in May 2018 to pay the United States $23.8 million related to claims involving Pfizer's relationship with Patient Access Network Foundation to fund co-payments for Pfizer's renal cell carcinoma drugs Sutent and Inlyta and Pfizer's arrhythmia drug Tikosyn; (iii) H. Lundbeck A/S ("Lundbeck") agreeing in June 2018  to pay the United States $52.6 million related to claims involving Lundbeck's relationship with CVC to fund co-payment for  Lundbeck's Huntington's Disease drug Xenazine; and (iv) Actelion Pharmaceuticals US, Inc. ("Actelion") agreeing in December 2018 to pay the United States $360 million related to claims involving Actelion's relationship with CVC to fund co-payment for Actelion's Hypertension drugs Tracleer, Ventavis, Veletri, and Opsumit. Additionally, as set forth in publicly available corporate filings, multiple additional drug manufacturers and co-payment charities are currently under investigation by and responding to subpoenas from the U.S. Attorney's Office for the District of Massachusetts related to similar alleged schemes. *See, e.g.*, Johnson and Johnson 2017 Form 10-Q ("In April 2017, Johnson & Johnson received a subpoena from the United States Attorney for the District of Massachusetts seeking documents broadly relating to pharmaceutical co-payment support programs for OLYSIO[TM], SIMPONI® and STELARA®."); Gilead Sciences, Inc. 2017 Form 10-K ("In February 2016, we received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting documents related to our support of 501(c)(3) organizations that provide financial assistance to patients and documents concerning our provision of financial assistance to patients for our HCV products. We are cooperating with this inquiry.")

potential to severely limit future revenues for several high priced blockbuster Medicare Part D

drugs through (i) lowered overall funding for patient out-of-pocket assistance (ii) lesser ability

for individual pharmaceutical donors to guide their funding towards specific drugs.").

70.     The December 2017 UT Settlement with the United States was based on the

United States' claims that UT's conduct violated the AKS and FCA, thereby leaving a Federal

healthcare program (in this case, Medicare) "bear[ing] the cost."

71.     Specifically, the United States alleged the following:

UT made donations to CVC's PAH fund and used it as a conduit to pay the co-payment obligations of thousands of Medicare patients taking the [UT] Drugs, to eliminate price sensitivity of patients purchasing or physicians prescribing the [UT] Drugs, and to induce those patients' purchases of the [UT] Drugs.  From February 2010 through January 2014, UT routinely obtained data from CVC detailing how many patients on each [UT] Drug CVC had assisted and how much CVC had spent on those patients.  In deciding whether and how much to donate to CVC, UT considered the revenue it would receive from prescriptions for Medicare patients who received assistance from CVC to cover their co-payments for the [UT] Drugs. UT used data from CVC to confirm that UT's revenue far exceeded the amount of UT's donations to CVC.  At the same time, UT had a policy of not permitting Medicare patients to participate in its free drug program, which was open to other financially needy patients, even if those Medicare patients could not afford their co-payments for UT Hypertension Drugs.  Instead, in order to generate revenue from Medicare and to induce purchases of the [UT] Drugs, UT referred Medicare patients prescribed the [UT] Drugs to CVC, which resulted in claims to federal healthcare programs to cover the cost of the drugs.

(UT Settlement Agreement at 2, attached at **Exhibit A**.)

72.     Under the terms of the UT Settlement, UT agreed to pay the United States $210

million to resolve the United States' AKS and FCA claims on behalf of Medicare. The UT

Settlement does not redress the harm the Defendants' illegal conduct caused to Medicare

Advantage plans, such as Plaintiffs' Assignors and the Class Members.

*The Impact on Plaintiffs and Medicare Advantage*

73.     The UT Settlement did not settle any claims that Plaintiffs' Assignors and the

Class Members may have against Defendants.

74.     Defendants' misconduct damaged Plaintiffs' Assignors and the Class Members.

Specifically:

- UT made donations to CVC's PAH fund and used it as a conduit to pay the co-payment obligations of thousands of Medicare Advantage patients taking the UT Hypertension Drugs;

- Defendants' conduct eliminated price sensitivity of patients purchasing or physicians prescribing UT Hypertension Drugs, which in turn enabled UT to raise the price of UT Hypertension Drugs, quickly and outside of ordinary market conditions. Medicare Advantage programs were left to bear the cost, while CVC was able to demonstrate "results" to UT—if UT "donated" money to CVC, it would make money, not only off the new "customers" but also by its ability to raise prices;

- Defendants' conduct caused Medicare Advantage patients to purchase the UT Hypertension Drugs;

- UT routinely obtained data from CVC detailing how many patients, including Medicare Advantage patients, on each [UT] Drug CVC had assisted and how much CVC had spent on those patients;

- In deciding whether and how much to donate to CVC, UT considered the revenue it would receive from prescriptions for Medicare Advantage patients who received assistance from CVC to cover their co-payments for the UT Hypertension Drugs;

- UT used data from CVC to confirm that UT's revenue far exceeded the amount of UT's donations to CVC;

- UT ensured that Medicare Advantage bore the cost of UT Hypertension Drugs by employing a policy of not permitting Medicare Advantage patients to participate in UT's free drug program (*i.e.*, Option 1 described above), which was open to other financially needy patients, even if those Medicare Advantage patients could not afford their co-payments for UT Hypertension Drugs; and

- To generate revenue from Medicare Advantage and to induce purchases of the UT Hypertension Drugs, UT referred Medicare Advantage patients prescribed the UT Hypertension Drugs to CVC, which, upon CVC approving coverage of patients' co-payments, triggered Plaintiffs' Assignors' obligations to cover the cost of the UT Hypertension Drugs.

75.     Because of Defendants' scheme, Plaintiffs' Assignors and Class Members paid for prescriptions they would not have otherwise paid and there was a direct relationship between the misconduct at issue here and the payments Plaintiffs' Assignors and Class Members made for Medicare Advantage patients.

76.     Defendants knew and intended that their scheme would increase the number of prescriptions used by Medicare Advantage patients for the UT Hypertension Drugs.

77.     Plaintiffs' Assignors and Class Members were the primary and intended victims of Defendants scheme and the injury to them was a foreseeable and natural consequence of the scheme.

78.     Plaintiffs' Assignors and Class Members suffered direct economic injury as a direct and proximate cause of Defendants' scheme and are therefore best suited to advance and pursue the recovery of the claims asserted in this Complaint.

79.     Plaintiffs' claims here are focused not just on UT, but also on CVC.  The Co-payment Circumvention Enterprise carried out by Defendants was a co-payment assistance conspiracy scheme aimed at Defendants' shared goal of growing CVC's PAH fund and thereby enabling CVC's directors and officers to use CVC's burgeoning funds as justification to increase their executive compensation, as evidenced in Paragraph 42 above.  Defendants' scheme increased the number of patients covered by Medicare Advantage (among other Federal healthcare programs) who were receiving co-payment assistance for UT's Hypertension Drugs from CVC's PAH fund, triggering Plaintiffs' Assignors' coverage obligations for these Medicare Advantage patients, eliminating price sensitivity to UT Hypertension Drugs, and allowing UT to increase its revenues and profits for UT Hypertension Drugs.

80.     For Defendants, this was a "win-win" arrangement.  UT's donations to CVC were directed by UT to CVC's PAH fund and, in return, co-payment assistance for these UT Hypertension Drugs was provided by CVC for patients covered by Medicare Advantage.  As CVC illegally provided data and information to UT regarding the profitability of UT's donations to CVC's PAH fund, UT increased its donations to the PAH fund.  UT's increasing donations to CVC's PAH fund resulted in more Medicare Advantage patients receiving co-payment assistance, the elimination of price sensitivity for UT Hypertension Drugs, and increased profits for UT.  And all along the way, as UT's donations to CVC's PAH fund continued to rise, CVC's executives increased their own compensation and benefits.

81.     With respect to the elimination of price sensitivity for UT Hypertension Drugs noted above, information from the Centers for Medicare and Medicaid Services ("CMS") and Plaintiffs' Assignors demonstrates how Defendants' scheme eliminated price sensitivity of patients purchasing or physicians prescribing UT Hypertension Drugs and resulted in Federal healthcare programs bearing the cost.  For example, CMS's Medicare Part D data shows that for UT's best-selling PAH drug, Adcirca, Medicare spending rose from $62 million in 2012, to $111 million in 2013, to $156 million in 2014, to $212 million in 2015, to more than $275 million in 2016.

82.     The CMS Medicare Part D data further provides that the Annual Growth Rate in Spending per dose rose during this 2012-2016 period at a rate of 20.6%—from $23.90 per dose in 2012, to $28.67 per dose in 2013, to $34.21 per dose in 2014, to $41.59 per dose in 2015, to $50.47 per dose in 2016.

83.     The chart below illustrates Adcirca's rising price and UT's revenue growth from Adcirca[10] sales from Medicare—and the corresponding lack of price sensitivity for Adcirca and the burden imposed on Federal healthcare programs.



84.     Plaintiffs' Assignors' data for their covered beneficiaries yields similar findings. Plaintiffs' Assignors paid for Adcirca prescriptions on behalf of covered beneficiaries in a total amount of over $15 million.

85.     Plaintiffs' Assignors paid over $24.8 million in claims for the UT Hypertension Drugs from January 1, 2010 through 2017. Information in the exclusive control of Defendants will demonstrate that a significant portion of the co-payments paid on behalf of the beneficiaries of Plaintiffs' Assignors were made by CVC in connection with Defendants' Co-payment Circumvention Enterprise.

86.     Plaintiffs' Assignors were not privy to which financially needy patients were being covered as a result of UT's donations to CVC's PAH fund.  Plaintiffs' Assignors'

---

[10]     UT markets and sells Adcirca under a license agreement with Eli Lilly & Co.

obligations to cover claims for the UT Hypertension Drugs only arose when covered patients

satisfied their co-payment obligations and Plaintiffs' Assignors did not and could not have

known that their reimbursement obligations were caused by Defendants' misconduct.

87.     Defendants' documents and disclosures clearly demonstrate that they possess

information to show exactly which patients received co-payment assistance.  For example:

- CVC's Form 990 Tax Filings state in Supplemental Information to Schedule I, Part I,

   Line 2:

   > Financial grants are given when an individual specifies he/she has a
   > disease supported by Caring Voice and he/she meets stated income
   > guidelines.   Individuals fill out an application for financial
   > assistance which must be accompanied by a medical certification
   > from their physician documenting their diagnosis.  Grant funds are
   > paid to third party pharmacies or insurance companies after proof is
   > received that the patient has incurred therapy costs associated with
   > the specific diagnosis.  ***Caring Voice monitors the use of grant
   > funds for individuals using proprietary database software.   The
   > database maintains all records to substantiate the amount of an
   > individual's grant, the grantee's eligibility and payments made on
   > the grant***.[11]

- CVC's Code of Conduct (adopted by CVC's Board of Directors on July 22, 2017) states

   that CVC will:

   > Maintain accurate and complete books and records, including
   > accounting and financial data, and retain such books and records in
   > accordance with applicable federal, state and local laws and
   > regulations, Company's record retention policies and procedures
   > and Company instructions.[12]

Accordingly, Defendants have represented in publicly available filings and other documents that

they maintain data and information that will readily (and efficiently) assist the parties in

---

[11]     *See* CVC's Form 990 Tax Filings, attached as **Exhibit M**.

[12]     *See* CVC's Code of Conduct, attached as **Exhibit J**.

identifying the specific claims and charges at issue in this class action lawsuit. Those documents will also provide the identity of the Class Members who were harmed by Defendants' misconduct, making the identity of Class Members easily ascertainable.

88.     Plaintiffs' Assignors' data confirms that the volume (or quantity) of the UT Hypertension Drugs paid for by Plaintiffs' Assignors declined dramatically after Defendants' Co-payment Circumvention Enterprise was uncovered.  This provides direct evidence of the causal effect of Defendants' conspiracy and misconduct.

89.     For example, as set forth in the following chart, AvMed, one of Plaintiffs' Assignors, paid $1,024,062.53 in claims for the UT Hypertension Drugs in 2018 while paying merely $81,136.54 in claims for the UT Hypertension Drugs in 2019—a 92 percent decrease.



90.     Similarly, as set forth in the following chart, another of Plaintiffs' Assignors, Family Physicians Group, paid $1,345,217 in claims for the UT Hypertension Drugs in 2017

while paying only $140,479 in claims for the UT Hypertension Drugs in 2018—an 89.5 percent

decrease.



91.     Moreover, as set forth in the following chart, Plaintiffs' Assignor, Fallon

Community Health Plan's payment of claims for the UT Hypertension Drugs decreased by 22.5

percent from 2017 to 2018.



92.     As noted above, Defendants' scheme benefited CVC and its executives.  During

the time period Defendants carried out the Co-payment Circumvention Enterprise, CVC's

President was Pamela R. Harris.  Ms. Harris, along with her daughter, Samantha Harris (Ms.

Samantha Harris later changed her name to Samantha Green), who served as CVC's Vice-

President, were among a handful of executives whose compensation is set forth in Part VII of

CVC's annual Form 990 Tax Filings.  CVC's Form 990 Tax Filings demonstrate that Pamela R.

Harris' total executive compensation (not even including certain rental income she received from

CVC and other potential benefits) rose nearly 70% between 2011 and 2015, from around

$248,000 in 2011 to over $421,000 in 2015.  (*See* CVC's Form 990 Tax Filings, attached as

**Exhibit M**.)  Her daughter's total executive compensation rose by over 100% during this same

period.  (*See id.*)

## **TOLLING OF THE STATUTE OF LIMITATIONS**

### **DISCOVERY RULE TOLLING**

93.     Plaintiffs, their Assignors, and the Class Members had no way of knowing about the Co-payment Circumvention Enterprise until after United Therapeutics disclosed the Department of Justice's investigation in their SEC form 10-Q for the period ending June 30, 2016 (published on July 28, 2016), even this disclosure was shrouded in secrecy with no mention of the UT drugs affected or which PAP's the investigation involved.

94.     Defendants failed to disclose the Co-payment Circumvention Enterprise. Rather, at all times before the public disclosure and the UT Settlement Agreement, CVC certified compliance with the OIG's requirements and UT certified compliance with the AKS and FCA when seeking payment for UT Hypertension Drugs from Plaintiffs' Assignors and the Class Members.  Accordingly, Plaintiffs' Assignors and the Class Members did not have actual or constructive knowledge that they were defrauded and injured by the Co-payment Circumvention Enterprise.

95.     Plaintiffs, their Assignors, and the Cass Members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were participating in the Co-payment Circumvention Enterprise. Accordingly, Plaintiffs, their Assignors, and the Class Members did not know, and could not have known, that they had been defrauded and injured by Defendants' Co-payment Circumvention Enterprise

96.     For these reasons, all applicable statutes of limitations are tolled by operation of the discovery rule with respect to Plaintiffs' claims alleged herein.

## EQUITABLE ESTOPPEL

97.     Defendants were under a continuous duty to disclose to Plaintiffs' Assignors the existence and true nature of the Co-payment Circumvention Enterprise, including the subsequent obligations for payment triggered by Defendant's misconduct.

98.     The existence of Defendants' co-payment assistance scheme was a material fact, and Defendants concealed its existence and instead falsely represented that they were in compliance with federal regulations including the FCA and AKS.  When Defendants made these misrepresentations and concealed their co-payment assistance conspiracy scheme, they had knowledge of the facts surrounding the scheme's existence. Defendants concealed the co-payment assistance conspiracy scheme and made misrepresentations about it with the intention that Plaintiffs' Assignors and Class Members would rely on said misrepresentations and would pay for UT's Hypertension Drugs.  Defendants' concealment induced Plaintiffs to reasonably rely and act upon these misrepresentations and were misled into paying for UT Hypertension Drugs.  *See Safe Environment of America, Inc. v. Employers Ins. of Wausau,* 278 F. Supp. 2d 121, 126-27 (D. Mass. 2003).

99.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action and all equitable principles of tolling should apply.

## CLASS ALLEGATIONS

100.     Plaintiffs bring this action on behalf of themselves and the following classes:

Class 1: All Medicare Advantage Organizations and at-risk, first-tier, and downstream entities in the United States and its territories that from February 1, 2010 through December 31, 2017, pursuant to Medicare contracts offering Medicare benefits, provided services, purchased the subject pharmaceuticals, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of UT Hypertension Drugs resulting from CVC's co-payment assistance.  This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal

government; and (c) any judges or justices involved in this action and any members of their immediate families.

**Class 2:** All self-funded, third party payors and related entities in the United States and its territories that from February 1, 2010 through December 31, 2017, provided services, purchased the subject pharmaceuticals, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of UT Hypertension Drugs resulting from CVC's co-payment assistance. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

101.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 both individually and on behalf of a national damages class.

102.    As discussed in this Complaint, the Co-payment Circumvention Enterprise triggered coverage obligations and resulted in increased sales of UT Hypertension Drugs, the cost of which were borne by Plaintiffs' Assignors and the Class Members.  The damages suffered by Plaintiffs apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations that assigned their rights to Plaintiffs).  Class action law has long recognized that, when companies engage in conduct that has uniformly harmed a large number of claimants such as Plaintiffs and other third-party payers, class resolution is an effective tool to redress the harm.

103.    Plaintiffs' Assignors and Class Members have been deprived of property and money by being caused to pay for prescriptions of UT Hypertension Drugs due to and as a result of Defendants triggering the Class Members' coverage obligations by forming the Co-payment Circumvention Enterprise and engaging in the racketeering activity as alleged throughout this Complaint.

104.    The Classes are properly brought and should be maintained as nationwide class

actions under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality,

typicality, and adequacy:

Numerosity:   There are hundreds of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States whose coverage obligations and subsequent payment for UT Hypertension Drugs were triggered and caused by the Co-payment Circumvention Enterprise.   Thus, the numerosity element for class certification is met.

Commonality:  Questions of law or fact are common to all members of the Classes. Defendants' co-payment assistance conspiracy scheme and racketeering activity carried out by the Co-payment Circumvention Enterprise have a common, adverse effect on all Class Members.  Defendants' misconduct was directed at all members of these Classes.  Defendants' unlawful co-payment assistance conspiracy scheme and racketeering activity carried out by the Co-payment Circumvention Enterprise had a common, adverse effect on all purchasers of the UT Hypertension Drugs whose coverage obligations were triggered by Defendants' conduct.  Therefore, common questions of law or fact are prevalent throughout the classes, *i.e.*, whether Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' coverage obligations and subsequent payment for UT PAH Drug prescriptions.   Each Class Member shares the same needed remedy, *i.e.*, reimbursement for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of Defendants' co-payment assistance conspiracy scheme and racketeering activity that triggered Class Members' coverage obligations.

Typicality:  Plaintiffs' claims are typical of the claims of the Classes because their claims arise from the same course of conduct by Defendants, *i.e.*, Defendants' formation of the Co-payment Circumvention Enterprise and racketeering activity unlawfully triggering Class Members' coverage obligations and subsequent submission of bills for payment for UT Hypertension Drugs and actual payment that would otherwise not have been made but for Defendants' conduct.  Plaintiffs' claims are, therefore, typical of the Classes.

Adequacy:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs' interests in vindicating these claims are shared with all members of the Classes. In addition, Plaintiffs are represented by competent and experienced counsel in class action litigation.

105.    The Classes are properly brought and should be maintained as a class action under

Rule 23(b) because a class action is the superior method for resolving these claims.  Pursuant to

Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Classes.  Defendants deliberately conspired to trigger Plaintiffs' Assignors' coverage obligations for the UT Hypertension Drugs through the formation of the Co-payment Circumvention Enterprise that subsequently resulted in the submission and payment of UT Hypertension Drugs by Plaintiffs' Assignors that otherwise would not have been paid.

106.    Plaintiffs' Assignors paid for prescriptions of UT Hypertension Drugs that they otherwise would not have paid but for Defendants' Co-payment Circumvention Enterprise and racketeering activity.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)

107.    Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint.

108.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

109.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

110.    The elements of a RICO claim under § 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

### *Description of the Co-payment Circumvention Enterprise*

111.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

112.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

113.     The Co-payment Circumvention Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants UT and CVC, including their employees and agents.

114.     The Co-payment Circumvention Enterprise functioned as an ongoing and continuing unit. The Co-payment Circumvention Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Enterprise.

115.     The Co-Payment Circumvention Enterprise had a common purpose that united its members.  This purpose was to profit from the illegal kickbacks and referrals. The common purpose was accomplished by: (1) growing CVC's PAH fund and CVC's executive compensation and (2) by increasing the number of patients who had their drugs purchased by Plaintiffs' Assignors, thereby increasing the amount of money UT made from the UT Hypertension Drugs.  By funneling and steering people into CVC's PAH fund for the UT Hypertension Drugs, the Co-payment Circumvention Enterprise increased UT's number of Medicare-covered "customers," thereby triggering Plaintiffs' Assignors' coverage obligations for

these Medicare Advantage patients and eliminating price sensitivity to UT Hypertension Drugs. These two strands of the plan worked hand-in-hand and resulted in a vicious cycle that expanded profits for both CVC's officers and directors and UT—at the cost to Plaintiffs' Assignors and other MA Plans, and UT "customers."

116.     Each of the Defendants received substantial revenue from participating in the Co-Payment Circumvention Enterprise. Such revenue was exponentially greater than it would have been in the absence of such Enterprise. Each portion of the Enterprise benefitted from the existence of the other parts.

117.     The Co-payment Circumvention Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant.

118.     There were interpersonal relationships between those associated with the Co-payment Circumvention Enterprise. This includes relationships: (1) among CVC's officers and directors and relationships among UT's officers, directors, principals, and agents; and (2) relationships between CVC and UT.  This is evidenced by CVC sending UT the data and information UT used to evaluate how much profit it was making from donating money and directing "customers" to CVC.  The OIG explicitly warned CVC not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and CVC certified its understanding and compliance with the OIG's warnings.  But CVC and UT participated in this conduct anyway.  UT settled the DOJ's AKS and FCA claims for $210 million for this illegal conduct.  This conduct shows that CVC and UT were communicating information important to their scheme through the mail and wires to profit illegally and that they had a relationship.

119.    The Co-payment Circumvention Enterprise had the longevity sufficient to permit its associates to pursue the enterprise's purpose.  It lasted for years, during which time its purposes were pursued.  CVC grew its fund for the UT Hypertension Drugs as UT increased its annual "donations" to CVC.  And CVC's officers and directors increased their annual compensation, as detailed in CVC's Form 990 Tax Filings.  Moreover, UT insulated the price sensitivity of its Hypertension Drugs, as demonstrated by the 20.6% annual increase in the price of UT Hypertension Drugs.  UT also increased the number of "customers" buying UT Hypertension Drugs, which allowed UT to increase its profits.

120.    UT carried out its business activities both with CVC and without CVC, including marketing and selling UT Hypertension Drugs to other entities besides CVC.

121.    Moreover, CVC carried out its business activities both with UT and without UT as evidenced by CVC's co-payment funding of other diseases besides hypertension.

### *Conduct of the Enterprise's Affairs*

122.    Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-payment Circumvention Enterprise's affairs.  Both Defendants were associated with the Co-payment Circumvention Enterprise and both operated and managed the Co-payment Circumvention Enterprise.  Such participation included, but is not limited to: (1) CVC managing, collecting, and sharing data with UT so that UT could see its profit margin and returns on its donations to the CVC PAH fund; (2) UT managing the finances, providing CVC with the "donations" necessary for the co-payments, so the payment obligations of Plaintiffs' Assignors and the purported Class would be triggered; and (3) both CVC and UT steering and funneling patients to CVC's PAH fund.

41

123. At all relevant times, each Defendant has been aware of the Co-payment Circumvention Enterprises' conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

### *Defendants' Pattern of Racketeering Activity*

124. To carry out, or attempt to carry out, their scheme to defraud, Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-payment Circumvention Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

125. Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the Co-Payment Circumvention Enterprise. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud Plaintiffs' Assignors and Class Members.

126. As set forth throughout this Complaint, Defendants were engaged in a scheme to defraud Medicare and MA Plans, including Plaintiffs' Assignors. They funneled and steered patients into CVC's PAH fund for UT Hypertension Drugs, knowing Medicare and Plaintiffs' Assignors would ultimately bear the cost of the drugs. Defendants knew their scheme to funnel, steer, and refer were violative of the AKS and the FCA and that they were transmitting fraudulent information through mail and wire communications.

127.     Defendants use of the mails and wires to perpetuate their fraudulent Co-payment Circumvention Enterprise involved thousands of communications which involved, among others, the following:

     a. Communications from UT and CVC to people steering them away from UT's manufacturer-sponsored free-drug fund and into CVC's PAH fund;

     b. Transmittal of "donations" by UT to CVC so that CVC could pay the co-payments of UT's "customers" in CVC's PAH fund;

     c. Submission of certifications by UT and CVC in which they claimed to be in compliance with federal law, including the AKS and FCA;

     d. Submissions of data from CVC to UT so that UT could determine how much money it was making from its "donations" to CVC and how much more money it could make by increasing its "donations";

     e. Causing false claims, in violation of the FCA and AKS, to be submitted by pharmacies to Plaintiffs' Assignors and Class Members;

128.     The predicate acts of mail and wire fraud had the same purpose; that is, to make money by growing CVC's PAH fund as large as possible so that CVC's officers and directors could justify increasing their compensation and so that UT could get as many "customers" as possible for its UT Hypertension Drugs at the expense of Plaintiffs' assignors and other MA Plans. All of the predicate acts detailed above, including the certifications made by UT and CVC, as well as the wire communications in furtherance of their scheme, were for this purpose. If the certifications by UT to CMS had not been made, Plaintiffs' Assignors would not have purchased UT's products. If CVC's certifications had not been made, CVC would not have been permitted to administer its PAH Fund and Plaintiffs' Assignors would not have paid for the claims resulting from the unlawful conduct. The false certifications and contracts Defendants caused pharmacies to send over the mail and wires were done so UT could make larger "donations" to CVC's PAH fund and cause damage to Plaintiffs' Assignors.

129.     These predicate acts allowed the continuance of the scheme to increase

prescriptions and process for the UT Hypertension Drugs As a result, Plaintiffs' Assignors and

Class Members paid increased claims for prescriptions where CVC paid the co-payment.

130.     CVC and UT, including officers, directors, agents, and principals of both

organizations, participated in all of the predicate acts.  These individuals sent or caused to be sent

all of the fraudulent certifications and false contracts through the mails.  And they are the ones

who communicated among one another and others in furtherance of the scheme.  This includes,

but is not limited to, Pamela R. Harris and her daughter Samantha Harris (Green), who increased

their compensation every year as CVC took in more "donations."

131.     The victims of the predicate acts and the fraudulent scheme Plaintiffs' Assignors,

Medicare, other Medicare part C organizations and Medicare Advantage health plans, the

patients who needed these drugs and paid more in co-payments for them, and the several states

that contribute to Medicaid.  The fraudulent scheme orchestrated by the Co-payment

Circumvention Enterprise injured multiple people and stakeholders in the United States

healthcare system, causing multiple distinct injuries.

132.      The acts of mail and wire fraud included transmission of fraudulent claims and

the unlawful transmission of data and communications to further the racketeering scheme over

period of at least five years involving harm to multiple parties.

133.     Additionally, CVC was involved in similar fraudulent schemes with other drug

manufacturers.  It was engaged in similar schemes with Jazz, Lundbeck, and Actelion, each of

which resulted in settlements with the United States for violations of the AKS and FCA in 2018.

Specifically, Jazz settled for $57 million, Lundbeck settled for $52.6 million, and Actelion

settled for $360 million.  CVC's multi-faceted fraud involved multiple victims and predicate acts and is the type of broad and persistent racketeering activity that RICO was intended to stop.

134.    The Co-payment Circumvention Enterprise's fraudulent scheme and its predicate acts affected interstate commerce, distorting drug prices across several states.

135.    Moreover, the Co-payment Circumvention Enterprise's fraudulent scheme and its predicate acts proximately caused injury to Plaintiffs' Assignors' business and property. Plaintiffs' Assignors' duty to purchase UT Hypertension Drugs was triggered by Defendants' illegal scheme.  This proximately caused Plaintiffs' Assignors' injuries.  Defendants' predicate acts directly led to Plaintiffs' Assignors buying UT Hypertension Drugs for Plaintiffs' Assignors' enrollees in CVC's PAH fund.

136.    Accordingly, Defendants' violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Plaintiffs' Assignors, entitling Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)

137.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

138.    Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-payment Circumvention Enterprise described previously through a pattern of racketeering activity.

139.    UT knowingly agreed with CVC that UT would perform services that would facilitate the activities of the Co-payment Circumvention Enterprise and those who were running

it in an illegal manner.  Some of the services that UT performed were steering people away from

its manufacturer-sponsored free-drug fund and into CVC's PAH fund.  UT also provided CVC

with "donations" so that CVC could pay the co-payments of UT's "customers" in CVC's PAH

fund.  UT also sent certifications over the interstate mails and wires claiming it was in

compliance with federal law, including the AKS and FCA.  UT also used the data CVC sent it, in

violation of the AKS and FCA, to determine how much money it was making from its

"donations" to CVC and how much *more* money it could make by increasing its "donations."

Indeed, this exchange of data shows that UT and CVC were not engaged in parallel conduct but

were working together and had a meeting of the minds that they could both profit from the Co-

payment Circumvention Enterprise. The shared data showed how much money UT made the

prior year before from its "donations" to CVC and how much more it could make by increasing

its "donations."  It thus set out a roadmap of illegal activities and profits.

        140.    Further, CVC knowingly agreed with UT that CVC would perform services that

would facilitate the activities of the Co-payment Circumvention Enterprise and those who were

running it in an illegal manner.  Some of the services that CVC performed were steering people

into its CVC PAH fund.  CVC also sent certifications over the interstate mails and wires

claiming it was in compliance with federal law, including the AKS and FCA.  CVC also sent UT

data, in violation of the AKS and FCA, so UT could see how much money it was making from

its "donations" to CVC and how much *more* money it could make by increasing its "donations."

Indeed, this sharing of data shows that UT and CVC were not engaged in parallel conduct but

were working together and had a meeting of the minds that they could both profit from the Co-

payment Circumvention Enterprise.  CVC knew that the more money it accepted in "donations"

from UT, the more money CVC could justify paying its officers and directors in compensation. By illegally giving UT this data, CVC was soliciting greater contributions.

141.    UT knowingly agreed with CVC that one or both of them would commit at least two instances of mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires).  UT had actual or constructive knowledge that CVC had certified to HHS that it would not share data with manufacturers, allow manufactures to exert influence over it, or steer people to particular drugs.  In short, UT knew that CVC had certified that it would abide by the AKS and FCA.  UT knew that the scheme it was engaged in or was going to engage in was going to make all these certifications false (as well as the 2015 certifications).  It also knew that each time a pharmacy filled a prescription for someone in CVC's PAH fund, any certifications the pharmacist made that he or she would abide by federal law would be false.  UT also knew that any certifications it made to HHS or the Government about its compliance with federal law would be false.

142.    CVC knowingly agreed with UT that one or both of them would commit at least two instances of mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires).  CVC knew it had certified to HHS that it would not share data with manufacturers, allow manufactures to exert influence over it, or steer people to particular drugs. In short, CVC knew it had certified that it would abide by federal law and the FCA, and it knew that the scheme it was engaged in or was going to engage in was going to make all these certifications false (as well as its 2015 certifications).  It also knew that each time a pharmacy filled a prescription for someone in its PAH Drug fund, any certifications the pharmacist made that he or she would abide by federal law would be false.  CVC also knew that any certifications UT made to HHS or the Government about UT's compliance with federal law would be false.

143.     And both UT and CVC knew that any communications they had over the telephone, e-mail, or text message in furtherance of the scheme would be predicate acts.

144.     In short, both UT and CVC agreed to pursue the same objective of profiting illegally from the Co-payment Circumvention Enterprise. They agreed to divide the work of accomplishing this objective.  UT would make the "donations"; CVC would provide data; they would both steer clients and make false certifications.  Both UT and CVC intended to further this endeavor, which, as described above, when completed, amounted to a violation of 18 U.S.C. § 1962(c) that proximately and directly caused injury to Plaintiffs' assignors.

145.     Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d).

### COUNT III
### VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

146.     Plaintiffs re-allege an incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

147.     Defendants engaged in unfair, false, unconscionable, or deceptive acts or practices in violation of various state consumer protection laws, as set forth below.

148.     Defendants directly misrepresented to Plaintiffs' Assignors and Class Members that they were complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

149.     Defendants intended payers such as Plaintiffs' Assignors and Class Members to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose was to procure payment for UT Hypertension Drugs.

150.     These representations and certifications were made in an effort by Defendants to have the consuming public use the CVC PAH fund and were addressed to the market generally

by having improper and unnecessary prescriptions for UT Hypertension Drugs paid for by

Medicare, Plaintiffs' Assignors, and Class Members.  The ultimate consequence of this conduct

is a significant injury to the consuming public by, among other things, imposing additional costs

on the taxpaying public for Medicare.

151.     Plaintiffs' Assignors relied on these misrepresentations to their detriment, which

were material to their decision to pay for UT Hypertension Drugs.

152.     Plaintiffs' Assignors and Class Members were directly and proximately injured by

Defendants' conduct, suffered an injury in fact, and suffered actual, ascertainable damages.

Plaintiffs' Assignors and Class Members would not have reimbursed for nearly as much of the

UT Hypertension Drugs as they did, had Defendants refrained from engineering the false

representations or otherwise disclosed its schemes.

153.     Accordingly, Plaintiffs and other similarly situated payers in the Class in each of

the below jurisdictions, seek damages (including statutory damages where applicable), to be

trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and costs

of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

### Connecticut Unfair Trade Practices Act
**(Conn. Gen. Stat. §§ 42-110a, *et seq.*)**

154.     Plaintiffs, Plaintiffs' Assignors, and Defendants are "persons" within the meaning

of Connecticut Unfair Trade Practices Act ("Connecticut UTPA").  Conn. Gen. Stat. Ann. § 42-

110a(3).

155.     Defendants challenged conduct occurred in "trade" or "commerce" within the

meaning of Conn. Gen. Stat. § 42-110a(4).

156.     The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).

157.     Defendants' conduct constitutes "unfair or deceptive" acts in violation of the Connecticut UTPA.

158.     Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

159.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

160.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Connecticut.

161.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Connecticut.

162.     Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General and Commissioner of Consumer Protection pursuant to Conn. Gen. Stat. § 42-110g.

163.     Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

**<u>Florida Deceptive and Unfair Trade Practices Act</u>**
**(Fla. Stat. Ann. §§ 501.201, *et seq.*)**

164.     Plaintiffs and Plaintiffs' Assignors are "interested persons" and "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Fla. Stat. Ann. § 501.203(6)-(7).

165.     Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

166.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Sta. § 501.204(1).

167.     Defendants' conduct constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

168.     Defendants knew or should have known that their conduct was in violation of FDUTPA.

169.     Defendants' illegal conduct substantially affected Florida commerce and consumers.

170.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

171.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Florida.

172.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Florida.

173.     Plaintiffs seek to recover against each Defendant the amount of their actual damages, attorneys' fees, and costs pursuant to Fla. Stat. Ann. §§ 501.211(2) and 501.2105(1).

**<u>Massachusetts Regulation of Business Practice & Consumer Protection Act</u>**
**(Mass. Gen. Laws Ch. 93a, §§ 1, *et seq.*)**

174.     Plaintiffs, Plaintiffs' Assignors and Defendants are "persons" within the meaning of the Massachusetts Regulation of Business Practice & Consumer Protection Act ("Massachusetts CPA").  Mass. Gen. Laws ch. 93A, § 1(a).

175.     Defendants are engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

176.     The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful.  Mass. Gen. Laws Ann. ch. 93A, § 2(a).

177.     Defendants conduct constitutes "unfair or deceptive acts or practices" under Massachusetts CPA.

178.     Defendants knew or should have known that their conduct was in violation of Massachusetts CPA.

179.     Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

180.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

181.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Massachusetts.

182.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Massachusetts.

183.    Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11.

184.    Plaintiffs also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts CPA.

## New York General Business Law
### (N.Y. Gen. Bus. Law § 349)

185.    The New York General Business Laws ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.

186.    Defendants' conduct constitutes "deceptive acts" in violation of the New York GBL.

187.    Defendants' illegal conduct substantially affected New York commerce and consumers.

188.    Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

189.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of New York.

190.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of New York.

191.     As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available pursuant to N.Y. Gen. Bus. Law § 349.

## Pennsylvania Unfair Trade and Consumer Protection Law
### (73 Pa. Cons. Stat. §§ 201-1, *et seq.*)

192.     Plaintiffs, Plaintiffs' Assignors and Defendants are "persons" within the meaning of the Pennsylvania Unfair Trade and Consumer Protection Law ("Pennsylvania UTPA").  73 Pa. Cons. Stat. § 201-2(2).

193.     Defendants are engaged in "trade or commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

194.     The Pennsylvania UTPA prohibits "unfair or deceptive acts or practices," including "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Cons. Stat. § 201-2(4).

195.     Defendants conduct constituted "unfair or deceptive acts or practices" in violation of the Pennsylvania UTPA.

196.     Defendants knew or should have known that their conduct was in violation of the Pennsylvania UTPA.

197.     Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

198.     Plaintiffs' Assignors relied upon the Defendants' material misrepresentations regarding the certifications their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

199.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

200.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Pennsylvania.

201.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Pennsylvania.

202.     Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available pursuant to 73 Pa. Cons. Stat. § 201-9.2(a).

### South Carolina Unfair Trade Practices Act
### (S.C. Code Ann. §§ 39-10, *et seq.*)

203.     Plaintiffs, Plaintiffs' Assignors, and Defendants are "person[s]" under the South Carolina Unfair Trade Practices Act ("South Carolina UTPA").  S.C. Code Ann. § 39-5-10(a).

204.     Defendants are engaged in "trade or commerce" as defined by the South Carolina UTPA. S.C. Code Ann. § 39-5-10(b).

205.     The South Carolina UTPA makes unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. S.C. Code Ann.  § 39-5-20.

206.     Defendants' conduct constitutes "unfair or deceptive acts or practices" in violation of the South Carolina UTPA.

207.    Defendants knew or should have known that their conduct was in violation of the South Carolina UTPA.

208.    Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

209.    Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

210.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of South Carolina.

211.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of South Carolina.

212.    Because Defendants' unfair and deceptive practices caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $200, whichever is greater, discretionary punitive damages, reasonable attorney's fees and costs, injunctive relief, and all other proper and just relief available under the South Carolina UTPA.

## Wisconsin Deceptive Trade Practices Act
### (Wis. Stat. § 100.18)

213.    Plaintiffs and Plaintiffs' Assignors are "the public" within the meaning of the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"). Wis. Stat. § 100.18(1).

214.    Plaintiffs and Plaintiffs' Assignors are "persons" within the meaning of Wis. Stat. § 100.18(1).

215.    Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

216.    The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

217.    Defendants' conduct constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

218.    Defendants knew or should have known that their conduct was in violation of the Wisconsin DTPA.

219.    Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

220.    Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

221.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Wisconsin.

222.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Wisconsin

223.    No business relationship, contractual or otherwise, existed or exists between Plaintiffs' Assignors and Defendants.

224.    Plaintiffs seek damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

<u>**COUNT IV**</u>
**TORTIOUS INTERFERENCE WITH PLAINTIFFS' BUSINESS EXPECTANCY**

225.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

226.     To prevail on a tortious interference claim, the plaintiff must provide that (1) the plaintiff had an advantageous relationship with a third party (*e.g.*, a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

227.     Accordingly, Defendants conspired to tortiously interfere with Plaintiffs' Assignors' business expectancy, entitling Plaintiffs to bring this action on their behalf for their actual damages (including loss of profits), costs of suit, and reasonable attorneys' fees.

## COUNT V
## CIVIL CONSPIRACY TO TORTIOUSLY INTERFERE WITH PLAINTIFFS' BUSINESS EXPECTANCY

228.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

229.     Defendants conspired to tortiously interfere with Plaintiffs' Assignors' contractual relations with their beneficiaries.

230.     Defendants conspired to increase the number of Medicare-covered "customers" using the CVC PAH, which triggered Plaintiffs' Assignors' coverage obligations for these Medicare Advantage patients and eliminating price sensitivity to UT Hypertension Drugs.

231.     Accordingly, Defendants conspired to tortiously interfere with Plaintiffs' Assignors' contractual relations, entitling Plaintiffs to bring this action on their behalf for their actual damages (including loss of profits), costs of suit, and reasonable attorneys' fees.

## COUNT VI
## UNJUST ENRICHMENT

232.     Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint.

233.     To plead a claim for unjust enrichment, the plaintiff must allege:(1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.

234.     As a result of the Co-payment Circumvention Enterprise and Defendants' unlawful conduct described above, Defendants have been unjustly enriched by, at a minimum, receipt of payments for UT Hypertension Drugs from Plaintiffs' Assignors at unlawfully inflated prices.

235.     Because Defendants concealed the Co-payment Circumvention Enterprise and their co-payment assistance conspiracy scheme and deception, Plaintiffs' Assignors were not aware of the true facts concerning the Co-payment Circumvention Enterprise and co-payment assistance conspiracy scheme described herein and did not benefit from Defendants' misconduct.

236.     Defendants knowingly accepted the unjust benefits of their Co-payment Circumvention Enterprise and co-payment assistance conspiracy scheme.

237.     As Defendants benefited from their unlawful conduct with knowledge that it was receiving increased revenues and profits for its UT Hypertension Drugs at inflated prices, it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains.

238.     As a result of Defendants' misconduct, the amount of their unjust enrichment should be returned to Plaintiffs, in an amount to be proven at trial.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully requests that this Court:

(a)     Certify the classes sought in this Complaint;

(b)     Enter judgment against Defendants and in favor of Plaintiffs for violations of the federal and state laws and legal standards invoked herein;

(c)     Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

(d)     Award the Plaintiffs damages (*e.g.*, three times overcharges or disgorgement of the monies paid for the UT Hypertension Drugs) in an amount to be determined at trial;

(e)     Award Plaintiffs its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO and applicable state law;

(f)     Find that Defendants are jointly and severally liable for all claims; and

(g)     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 27, 2020

_____

Adam Rivera (BBO # 693885)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Rd., 10th Floor
Coral Gables, FL 33134
(305) 614-2222
arivera@msprecoverylawfirm.com

Michael O. Mena (FL Bar No. 010664)
John W. Cleary (FL Bar No. 118137)
(*Pro Hac Vice* Forthcoming)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Rd., 10th Floor
Coral Gables, FL 33134
(305) 614-2222
fquesada@msprecoverylawfirm.com
mmena@msprecoverylawfirm.com
jcleary@msprecoverylawfirm.com

## APPENDIX

### *Representative Assignments to Plaintiffs*

**A1**.     On June 18, 2017, Fallon Community Health Plan, Inc. entered into an assignment with MSP Recovery, LLC.  Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies from Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered under Massachusetts law.  On June 20, 2017, MSP Recovery LLC, entered into an assignment with Series 17-04-631, LLC, a series of MSP Recovery Claims, Series, LLC, irrevocably assigning its right to recover payments as assigned from Fallon Community Health Plan.  Said assignment included the following language "[a]ssignor … hereby … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims," "Claims," "Assigned Assets," and "Assigned Documents"…whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the

Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto."  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered under Delaware law.

**A2.**     On December 14, 2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC.  Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered under Florida law.  On February 20, 2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments as assigned from Interamerican Medical Center Group, LLC (IMC).  Said assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims."  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law.

**A3.**     On May 3, 2016, Preferred Medical Plan, Inc. entered into an assignment with MSP Recovery LLC.  Said assignment included the following language "[c]lient hereby irrevocably

assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and all rights and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and /or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims',[] as also specified in Section 1.1."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law.  On August 8, 2016, MSP Recovery, LLC entered into an assignment with MAO-MSO Recovery II LLC, Series PMPI, irrevocably assigning its right to recover payments as assigned from Preferred Medical Plan, Inc.  Said assignment included the following language "[a]signer, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and is successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims . . . whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims.'" This second assignment contract was executed by individuals of majority, of sound mind, and with

legal authority to bind the respective parties.   This second assignment was entered under New York law.  Consideration was given between each party in executing these assignments.